Clerk's Office
Filed Date: October 10, 2023
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Joshua Adam Schulte,

Plaintiff,

— v —

Warden, Metropolitan Detention
Center (MDC),

Defendant.

22-CV-0766(EK)

# MOTION IN SUPPORT OF PLAINTIFF'S PETITION FOR WRIT OF HABEAS CORPUS

Joshua Adam Schulte
#79471054
MDC
P.O. Box 329002
Brooklyn, NY 11232

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................. 1

II.    EXHAUSTION OF ALL AVAILABLE ADMINISTRATIVE REMEDIES ... 3

III.    FIFTH AMENDMENT CHALLENGES ..................................... 5

    A.   Violation of Procedural Due Process ................................. 5

      1. The Concentration Camp Designation ........................... 6

      2. Liberty Interest in avoiding Concentration Camp Designation ... 8

      3. Insufficient Procedural Protections ............................ 10

    B.   Violation of Substantive Due Process .............................. 12

      1. Liberty interest ............................................. 12

      2. Confinement conditions outrageously arbitrary ................ 13

IV    EIGHTH AMENDMENT CHALLENGES .............................. 19

    A.   Indefinite solitary confinement violates the Eighth Amendment ... 19

      1. The Fourth Circuit finds long-term isolation unconstitutional ... 22

      2. Other Circuits have condemned the use of long-term solitary ... 24

      3. Long-term solitary confinement has never been applied to non-violent, non-death sentence inmate ........................... 26

      4. Unreasonable risk of serious and permanent injury or death ... 27

    B.   Exposure to Extreme Cold ....................................... 31

    C.   Nutritionally inadequate food .................................... 32

    D.   Sleep Deprivation ............................................... 34

    E.   Blasting speakers ............................................... 35

V    FIRST AMENDMENT CHALLENGES ................................. 36

    A   Freedom of speech — communications with others ................ 36

    B.   Access to courts and mail ....................................... 38

    C.   Access to the institution's library ............................... 39

    D.   Access to religious services ..................................... 39

VI    CONCLUSION .................................................... 40

1

## PRELIMINARY STATEMENT

The Supreme Court has noted that "[P]rison walls do not form a barrier separating prison inmates from the protections of the Constitution" and that "[w]hen a prison ... practice offends a fundamental Constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." Turner v. Safley, 482 U.S. 78, 84 (1987) (quoting Procunier v. Martinez, 416 U.S. 396, 405-06 (1974)).

The United States government has erroneously applied Special Administrative Measures (SAMs) pursuant to 28 C.F.R. § 501.3 related to the prevention of acts of violence upon Mr. Schulte despite no such finding, together with other arbitrary conditions of confinement not sanctioned by the sentencing court nor applied to the general population; Mr. Schulte has a liberty interest not to be so designated and constrained, which the government has imposed without proper procedural due process as required by Supreme Court precedent. Moreover, even if due process were appropriately followed, the conditions represent such an outrageously capricious and significant departure from normal prison life to likewise violate substantive due process. "There is no iron curtain drawn between the Constitution and the prisons of this country... [Prisoners] may not be deprived of life, liberty, or property without due process of law." Wolff v. McDonnell, 418 U.S. 539, 555-56 (1974). Accordingly, the Court must deem Mr. Schulte's placement, including all conditions of confinement, unconstitutional and grant the petition for writ of habeas corpus.

Mr. Schulte also challenges several specific conditions as violative of the Eighth Amendment's ban on cruel and unusual punishment, particularly the government's imposition of

2

indefinite solitary confinement, which has been found to cause serious mental illness, psychosis, permanent psychological and physiological damage, and even greatly increase mortality; this practice has been deemed a form of torture by the United Nations and found to be unconstitutional by numerous courts across the country. All challenged conditions present significant risks of serious harm, and are grossly disproportionate to the severity of the crime warranting punishment. See Hutto v. Finney, 437 U.S. 678, 685 (1978) (acknowledging that "[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards"); see also Montgomery v. Louisiana, 577 U.S. 190, 206 (2016) (acknowledging that "[p]rotection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the manner determining a defendant's sentence"); Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (acknowledging that conditions of confinement must not be "grossly disproportionate to the severity of the crime warranting imprisonment"). Accordingly, the court must grant the petition with respect to those challenged conditions that violate the Eighth Amendment.

 Finally, Mr. Schulte challenges specific conditions that violate other provisions of the Constitution, particularly the First Amendment, and which no legitimate penological interest exists. Those challenged conditions must also be vacated.

 Ultimately, the Court should grant the petition for writ of habeas corpus.

3

## EXHAUSTION OF ALL AVAILABLE ADMINISTRATIVE REMEDIES

The government alleges and Mr. Schulte does not dispute that administrative remedies were not exhausted for all issues. An inmate's failure to exhaust administrative remedies, however, is excusable if the remedies are, in fact, not "available." Ross v. Blake, 578 U.S. 632, 642 (2016)("An inmate... must exhaust available remedies, but need not exhaust unavailable ones."). The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." Id. (internal quotation marks and citations omitted). In Ross, the Supreme Court identified three non-exhaustive circumstances in which a court may find that internal administrative remedies are not available under the PLRA. Williams v. Priatno, 829 F.3d 118, 123 n. 2 (2d Cir. 2016). Two are relevant here: "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." The Northeast Regional Office refuses to consider the merits of all BP-10s. It denies them because the carbon copy of the 4th page is not as clear as the first page even though it is legible — and even goes so far as to refuse to accept photocopies or writing over the bled-through fourth page print; there can be no question that this is bad-faith obstruction of the process. Mr. Schulte has literally filed hundreds of BP-10s since 2018, and the Northeast Regional Office has refused to consider the merits of any of them. Accordingly, the administrative procedure is unavailable.

4

Secondly, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644. Here the MDC holds its administrative remedy forms under lock and key and refuses to provide them unless, in their "view", a form is warranted; so, when Mr. Schulte requested BP-11s even though the regional office refused to address the BP-10 in bad faith, MDC officials would refuse to provide them, telling Mr. Schulte he must start over. Or when the BOP failed to meet deadlines established in 28 CFR § 542.18 and Mr. Schulte requested the next form, MDC would pretend Mr. Schulte never filed a remedy and tell him to start over.

ALL of the issues raised here were fully exhausted as far as the BOP permitted Mr. Schulte to go, not once — but four separate times. See Reply Memo. in Support of Petitioner's Petition for Writ of Habeas Corpus at 19-22. The government has failed to adequately refute any of these allegations, which are supported by Mr. Schulte's complete record. Id. at Ex A-G. Mr. Schulte also has an established long record of attempting to exhaust administrative remedies and retaining all records of these attempts. See MCC Habeas Petition, U.S. v. Schulte, 17 CR 548, Dkt 447, including the administrative remedies in exhibits A, 447-1 (4 pgs); B, 447-2 (15 pgs); C, 447-3 (17 pgs); D, 447-4 (15 pgs); E, 447-5 (13 pgs); F, 447-6 (15 pgs); G, 447-7 (4 pgs); H, 447-8 (15 pgs); I, 447-9 (15 pgs); J, 447-10 (14 pgs); K, 447-11 (10 pgs); L, 447-12; M, 447-13 (4 pgs); N, 447-14 (3 pgs); O, 447-15 (3 pgs); P, 447-16 (3 pgs). It is difficult to imagine what more Mr. Schulte could have done.

Accordingly, all available administrative remedies have been exhausted, and the Court should review the merits of the petition.

5

# FIFTH AMENDMENT CHALLENGES

Mr. Schulte alleges both procedural and substantive Due Process violations for his conditions of confinement. The government thus far has erred by focusing on only a few of the conditions in the complaint; the law requires the Court to examine the conditions in toto. Mr. Schulte argues that the government cannot single him out of the entire prison population and torture him — simply because the government claims he committed crimes crimes against the government itself. First, the Supreme Court has found that the Due Process Clause of the Fifth Amendment requires sufficient procedures and process to impose atypical conditions for an extended period of time; and there are limits to the conditions based on the sentence imposed. Thus, the Court is compelled by Supreme Court precedent to invalidate ALL current conditions.

A. Violation of Procedural Due Process

Mr. Schulte argues that the government has violated his rights under the Due Process Clause by depriving him of a protected liberty interest without any meaningful review.

To assert a due process claim in connection with a classification decision, Mr. Schulte must show that he had a protected liberty interest in remaining free free from the classification and, if he had such an interest, that the government deprived him of the interest without affording him due process of law. See Walker v. Fischer, 523 F. Appx 43, 44 (2d Cir. 2013) (summary order) (citing Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001)).

6

## 1. The Concentration Camp Designation

The government contends at various times that Mr. Schulte is "in the SHU," "in administrative segregation," and "on SAMs". Officially, the BOP classifies Mr. Schulte as "administrative segregation," but follows none of the federal regulations related to this designation. See 28 CFR §§ 541.20-33. In truth, none of these classifications are accurate.

In reality, the government appears to have applied the wrong SAMs designation in addition to arbitrary torture. SAMs were imposed on Mr. Schulte in November 2018 pursuant to 28 CFR § 501.2 for "national security" reasons. In a memo from the Attorney General to the Warden, the primary directive is to:

> You are limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in you communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) classified information.

The SAMs does not in anyway dictate any conditions of confinement from commissary to cell temperature to lighting or even solitary confinement. Indeed, there exist no federal regulations outlining imposition of any SAMs.

28 CFR § 501.3 relates to the prevention of acts of violence and terrorism; it authorizes the Warden "to implement Special Administrative Measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury." The government appears to have implemented 501.3 on Mr. Schulte as he is housed with only 501.3 SAMs inmates, and restricted in the exact same manner: Mr. Schulte is not permitted staples, paper clips, hard cover books, pens, toothbrushes, and other instruments that could be

7

used as weapons pursuant to 501.3; Mr. Schulte must be shackled at all times, and can only be moved by at least one lieutenant and two other specially trained officers in case of violence; It even appears the commissary restriction is directly related to 501.3 as the government itself noted that "[T]he K-84 Commissary List is periodically updated and is in part modeled after the commissary list for the U.S. Penitentiary, Administrative Maximum Facility in Florence, Colorado..." which "houses inmates posing grave security risks." DKt. 30 at 4; in addition to numerous other violence-based conditions.

There are no other 501.2 SAMs inmates in the BOP, which is a very rare designation. Thus, the government has unconstitutionally applied 501.3 SAMs to Mr. Schulte since it has no idea how to deal with 501.2.

However, the government has additionally imposed tortures that not even 501.3 authorizes such as sleep deprivation, exposure to the extreme cold, inadequate nutrition, etc. Thus it would be inappropriate to label Mr. Schulte's designation "501.3", so hence forth the designation will be called "The Concentration Camp Designation." This designation includes all of Mr. Schulte's current conditions of confinement — both the 501.3 imposed conditions and the additional conditions.

8

## 2. Liberty Interest in avoiding Concentration Camp Designation

The Supreme Court explained that for prisoners, a liberty interest warranting due process protection "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force... nonetheless imposes a typical and significant hardship on the inmate in relation to the ordinary incidents of prison life." ~~Robert~~ Sandin v. Conner, 513 U.S. 472, 484 (1995); Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004).

Whether restraint constitutes an "atypical and significant hardship" depends on the totality of the circumstances, particularly the severity and the duration of the deprivation. See, e.g. Sealey v. Giltner, 197 F.3d 578, 586 (2d Cir. 1999).

Mr. Schulte's duration, standing alone, is sufficient in and of itself to establish a liberty interest as it's been 5 full years since imposition of the Concentration Camp, 2 full years since Mr. Schulte's transfer to MDC. See, e.g., Colon v. Howard, 215 F.3d 227, (2d Cir. 2000) (concluding that confinement for 305 days in standard SHU conditions met the Sandin standard).

But of course, Mr. Schulte has not been in standard SHU conditions, but Concentration Camp conditions, thus also qualifying based on atypicality of conditions standing alone. Atypicality shall be measured against the conditions afforded to the general population within a given prison system, as well as those in routine administrative confinement. See Welch v. Bartlett, 196 F.3d 389, 343 (2d Cir. 1999).

In fact, Mr. Schulte's conditions of confinement are worse than every death row inmate in the entire United States as well as worse than those that the Supreme Court found to be sufficiently restrictive to qualify as a liberty interest in Wilkinson v. Austin, 545 U.S. 209, ~~209~~ (2005). In Wilkinson, the Supreme Court considered a due process claim regarding the classification of Ohio inmates to the state's high security "Supermax"

9

prison for non-disciplinary reasons. Conditions at the Ohio State Penitentiary ("OSP") were more restrictive than any other prison facility in Ohio, including its death row and administrative control units. See id. at 214. Whereas OSP inmates were housed in "open-faced cells", allowing inmates to "easily communicate," ~~there~~ Austin v. Wilkinson, 189 F.Supp. 2d 719, ~~723-726~~ 725-26 (N.D. Ohio 2002), Mr. Schulte is housed in non-adjacent cells with solid steel doors and loud blasting speakers as an absolute barrier to communication. Whereas OSP inmates had daily recreation, Id. at 725, Mr. Schulte only has an opportunity 5 days per week. Whereas OSP inmates had "access to basketball Courts and work-out areas," Id., Mr. Schulte only has a rectangle to walk in. Whereas OSP inmates had access to books, programming, religious services and some congregate programming, Mr. Schulte has none of those things. Mr. Schulte is tortured in a concentration camp with inadequate food, blaring 24/7 lights, blaring 24/7 speakers, exposure to the extreme cold, no access to television, the institution's library, programming, work, educational opportunities, religious services, or any way to spend his time; he has access to only cold showers, insufficient real windows with a view or lighting, or any contact with any living soul.

    The government has erroneously focused on individual conditions, but the supreme Court dictates that they must be evaluated in toto: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP." Wilkinson, 545 US. at 223-224. And if OSP evaluated as a whole constitutes a liberty interest, then the <u>more severe restrictions</u> at the MDC concentration camp must likewise create a liberty interest.

10

3.  Insufficient Procedural Protections

A liberty interest having been established, due process requires that Mr. Schulte must be given "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence a fair and impartial hearing officer; and a written statement of the disposition." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004). In addition, the disciplinary ruling must be supported by "some reliable evidence." Id. (internal quotation marks omitted).

Not one of these things occurred prior to Mr. Schulte's designation and placement in the ███ MDC Concentration Camp. Not one.

There was no procedural due process before implementation of the 501.3 SAMs conditions — to which Mr. Schulte is NOT designated — and subsequent placement with 501.3 inmates nor was there procedural due process before implementation of the concentration camp tortures.

Procedural Due Process is violated.

Yet it doesn't stop there. Once a prisoner is placed in administrative segregation, prison officials must conduct a periodic review of the confinement to determine whether the prisoner remains a security risk. Proctor v. ~~LeClaire~~ LeClaire, 846 F.3d 597, 609 (2d Cir. 2017).

This has NEVER occurred either.

Procedural Due Process is yet again violated.

Specifically, two federal regulations govern here. 28 CFR § 541.25 requires the MDC to provide Mr. Schulte notification "of the reason(s)" for placement on "Administrative detention status." 28 CFR § 541.25(a). This is the official BOP classification for Mr. Schulte. Moreover, 28 CFR § 541.26 requires the MDC to review Mr. Schulte's placement every 30 days,

11

including a hearing that he can attend. § 541.26(c). None of this has ever occurred. No notification. No hearing. No review. Nothing.

Accordingly, the resulting Due Process violation compels this Court to order permanent injunctive relief and removal of Mr. Schulte from the MDC concentration camp, consistent with his petition for writ of habeas corpus.

12

B. Violation of Substantive Due Process

Due Process guarantees "more than fair process"; it "cover[s] a substantive sphere as well," "barring certain government actions regardless of the fairness of the procedures used to implement them," City of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986). "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." Sutherland v. City of New York, 680 F.3d 127, 151 (2d. Cir. 2012) (internal quotation marks and citation omitted). The Second Circuit has held that "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d. Cir. 1999). To succeed on a substantive due process claim a plaintiff must (1) "identify the constitutional right at stake" and (2) "demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Hurd v. Fredenburgh, 984 F.3d 1075, 1087 (2d cir. 2021).

1. Liberty interest

The first step in the substantive due process analysis is to determine the constitutional right that is implicated. Id. "The general liberty interest in freedom from detention is perhaps the most fundamental interest that the Due Process Clause protects." Francis v. Fiacco, 942 F.3d 126, 141 (2d Cir. 2019). This liberty interest is implicated "not only ... when a court initially sentences [someone], but also when prison officials interpret and implement the sentence that the trial court has imposed." Id. at 142. In Francis, the Second Circuit found that "[r]egardless of whether [prison's] course of conduct was legally justified (or perhaps even legally

13

required), their decision to implement [an inmate's] sentence in a manner that diverged from the sentence pronounced by the sentencing court implicated a liberty interest of the highest order." Id. And indeed, we have already established that Mr. Schulte has a liberty interest not to be designated at a concentration camp.

2. Confinement conditions outrageously arbitrary

As an initial matter, the Due Process inquiry is not an Eighth Amendment inquiry (developed later), but an inquiry into the conditions in toto relative to those in general population. The government is barred from selecting individuals it dislikes and imposing arbitrary confinement conditions so atypical from what would normally be expected as to shock the conscience.

   a. Typical General Population Inmate

The typical convicted "cadre" inmate at MDC is housed either with a bunkmate that he can choose or in a barracks-like environment. He has the ability to communicate with 100 other inmates, access to 24/7 recreation including basketball and other sports, access to board games like chess or Life, 24/7 access to television, radio, mp3 players, and a tablet; access to programming and educational activities such as completing the GED, college courses, teaching, and other opportunities; access to the institution's library to checkout books and other resources; 24/7 access to a computer to send and receive emails, access the law library, and printer; 24/7 access to telephones to spend 300 monthly phone minutes; weekly in-person, private family/friend physical visitation; contemporaneous mail access to engage in outside correspondence; the ability to spend time working a job and earning a small wage; access to commissary to purchase food, snacks, sweets, medicines, clothing, electronics, puzzles and other resources; 24/7 access to showers, private toilets, and a sink — all with hot water; access to religious services including

14

books and religious teachers; the ability to communicate directly with people; the units and cells are appropriately heated or cooled, there are no 24/7 lights at night, there is sufficient lighting, and a light switch to turn on or off the cell lights; there are desks within the cells and tables outside; in addition to normal programming there is the ability to enroll in programs such as the alcohol and drug program to earn credits that enable early release; there are sufficient additional mattresses, sheets, blankets and clothing; there is cleaning supplies; there are lockers for property storage; some are even able to leave the facility to conduct work outside; access to adequate food; are not handcuffed or shackled when transiting the prison.


b.  The Concentration Camp Inmate

    The concentration camp inmate can leave his cage once per day during the week either for 1 hour recreation or 1 hour "law library" consisting of a room the size of a shower with a computer; he cannot communicate with anyone; recreation has no basketball goal or balls, but an extra barbed wire surrounding it not in general population; has no access to board games, television, radio, mp3 players, or tablets; no access to programming or educational activities like college courses; no access to the institution's library or books; no access to email; only 30 minutes per month instead of 300 for calling—and only subject to realtime monitoring of only approved individuals; no in-person physical contact visitation; no mail correspondence—only delayed mail access to approved individuals; no access to work; extremely limited commissary with no access to most snacks, foods, or any access to electronics, clothing, puzzles, or other resources; only access to cold showers and cold water in the sinks; no access to religious services including books, teachers, ceremonies, etc. no ability to communicate with anyone; ~~normally~~ the unit and cells are

15

blasted with extreme cold including throughout the winter; the light switches are removed from the cells and cannot be turned off; there is a desk but no chairs as permitted in general population; no ability to enroll in programs to earn credits for early release; limited clothing, sheets, and blankets are provided; limited to no access to cleaning supplies; no lockers for property storage, must be stored on floor; no ability to leave facility; limited access to inadequate food; must be handcuffed, shackled and escorted by four individuals when transiting the prison; 24/7 speakers blast sounds; 24/7 cameras with night vision even when changing or showering;

c. Concentration Camp Designation Deprieves Any And All Activities

In the concentration camp, no activities are permitted. The MDC has a surplus of over 200 unused televisions in the shuttered East building, but refuses to put one in Mr. Schulte's cell. The MDC has a library, but prohibits Mr. Schulte from accessing it. The MDC has radios, mp3 players, and tablets in commissary, but refuses Mr. Schulte from purchasing them. The MDC has various puzzle books, but refuses Mr. Schulte from purchasing them. The MDC hires prisoners to do all its work as slave labor, but this would-be-delightful-slavery is not available to Mr. Schulte. Mr. Schulte can't attend religious services, engage in education services to take college classes, or communicate with anyone. The MDC has email services, but refuses to provide it to Mr. Schulte. Mr. Schulte can't even have a pen pal to mail. So, what, exactly, is available for Mr. Schulte to do in the 24 hours per day, 7 days per week? Twiddle his thumbs. Eat what little food is offered him. Void his bowels. And sleep. His only daily activity is to twiddle his thumbs — a monumental departure from the typical prison environment. Mr. Schulte now completely

16

understands Victor Frankle's "Man's Search for meaning" and particularly what it means to have a provisional existence. The gas chamber would be an improvement at the MDC concentration camp.

d. MDC Violates its own federal regulations

The MDC violates its own regulations with respect to conditions of confinement in the SHU and administrative Segregation, 28 CFR §§ 541.20-541.33. Particularly 541.31 - Conditions of confinement:

(a) Your living quarters will be well-ventilated, adequately lighted, appropriately heated, and maintained in a sanitary condition

...

(e) Food You will receive nutritionally adequate meals

...

(h) Programming activities...

The MDC also violates its own commissary regulation, 28 CFR § 541.31(h), which provides that only disciplinary segregation inmates can be restricted from commissary.

These violations of its own regulations demonstrates the arbitrariness with which it applies the Concentration Camp restrictions.

e. The Petty Torments

The government scoffs and disregards all those deemed as "petty torments." None of these are Eighth Amendment violations nor are they Fifth Amendment Violations on their own, but they are critical to single out as they provide a glimpse into the mind of prison officials — prison officials who had to convene a meeting, waste taxpayer dollars not only on their salaries and wasted times, but the tens of thousands of dollars that had to be spent JUST TO CREATE PETTY TORMENTS for its concentration camp

17

slaves. The MDC spent tens of thousands of dollars renovating K-84 to:

(1) remove all light switches in all 50+ cages

(2) modify the light fixtures to add special bright torture lights

(3) modify the plumbing to remove the hot/cold dials from all the showers and replace them with a button that activates cold water for 30 seconds

(4) rip out all the sinks to replace the hot/cold dials with push-buttons that must be held down continuously and which dispense only cold water.

(5) install 24/7 night vision cameras in two places in each cage

(6) pour a concrete slab for a "bed"

(7) pour a concrete slab that does not reach the desk as a "chair"

(8) remove the storage lockers so property must be stored on the floor

(9) black out the windows and install additional rebar

(10) remove the basketball goal from the recreation yard

(11) install additional barbed wire in the recreation yard

(12) install panels that cover the door's window and ~~make~~ a lock so slaves can't see out onto the unit or the officers

In addition, the MDC has arbitrarily restricted commissary to the point that it is the same used to punish disciplinary segregation. There are effectively no snacks, clothes, devices, or any food items — and those remaining are limited to only 1 purchase each in contrast with general population. Recently, the MDC banned peanut butter, tea, and toothpaste. This arbitrary action has nothing to do with national security, SAMs, or a penological interest.

It is not the items or specific modifications that matter — but the glimpse into the minds of top BOP/MDC officials spending taxpayer dollars just to think up petty and arbitrary restrictions for no reason.

18

f. The MDC Concentration Camp is arbitrary and outrageous

There can be no question that the MDC Concentration Camp designation imposes an arbitrary, outrageous, and shocking set of conditions that so monumentally depart from the typical prison punishment to constitute a violation of substantive due process. No deathrow inmate in the United States is subjected to the tortures imposed in the MDC's Concentration camp.

\* \* \*

Accordingly, Mr. Schulte has established both a procedural due process and a substantive due process violation. Clear Supreme Court precedent compels the Court to order permanent injunctive relief removing Mr. Schulte from the MDC Concentration Camp and all imposed confinement conditions consistent with 28 U.S.C. § 2241.

19

# EIGHTH AMENDMENT CHALLENGES

The Eighth Amendment prohibits any punishment which violates the civilized standards of humanity and decency or involves the unnecessary and wanton infliction of pain. See Estelle v. Gamble, 474 U.S. 97, 102-03 (1976). To prove an Eighth Amendment Violation, an inmate must show that he has been deprived of the minimum civilized measures of life's necessities. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). A proper Eighth Amendment analysis "is determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that 'currently prevail'." Kennedy v. Louisiana, 554 U.S. 407, 419 (2008) (citation omitted). And "courts must look beyond historical conceptions" when assessing Eighth Amendment challenges. Graham v. Florida, 560 U.S. 48, 58 (2010).


A. Indefinite Solitary confinement violates the Eighth Amendment

"[V]ery few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers... I hold this slow and daily tampering with the mysteries of the brain to be immeasurably worse than any torture of the body... because its wounds are not upon the surface, and it extorts few cries that human ears can hear." Charles Dickens, American Notes for General Circulation 123-24. French historian Alexis de Tocqueville added that solitary "devours the victims incessantly and unmercifully; it does not reform, it kills."

"A punishment need not leave scars to be cruel and unusual." Apodaca v. Raemisch, 139 S. Ct. 5, 6 (2018). "Courts and corrections officials must accordingly remain alert to the clear constitutional problems raised by keeping prisoners... in near-total isolation from the living world in what comes perilously close to a penal tomb."

20

Id. at 10 (internal citation and quotation marks omitted).

Indeed, "[t]he human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators." Davis v. Ayala, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring). More than a century ago the Supreme Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and particular mark of infamy." In re Medley, 134 U.S. 160, 170 (1890). According to the court, "experience demonstrated" that, when placed in isolation "[a] considerable number of prisoners fell, even after even a short confinement, into a semi-fatuous condition ... and others became violently insane; others still, committed suicide." Id. at 168.

In recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions materially indistinguishable from the challenged conditions here. "Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilations, and suicidal impulses... There is not a single study of solitary confinement wherein non-voluntary confinement that lasted longer than 10 days failed to result in negative psychological effects." Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 Crime & Delinquency 124, 132 (2003); "[E]ven a few days of

21

Solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U.J. L. & Pol'y 325, 327 (2006). An abundance of clinical literature regarding the psychiatric effects of solitary confinement supports a near-universal conclusion: "The restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental-functioning." Id. at 354. "It's unassailable that solitary confinement causes psychiatric harm." Id. See McClary v. Kelly, 4 F. Supp. 2d 195, 208 (WDNY 1998)("[A] conclusion... that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.").

As a direct result of the latest studies, the United Nations' Nelson Mandela Rules states that anything over 15 consecutive days in isolation is torture. The American Bar Association concurs, and passed a resolution in early 2018 that called on state officials to curtail and limit the use of solitary to conform with UN rules. In fact, calls to abolish or reform the use of solitary confinement are increasing nationwide. See e.g. Editorial Board, Solitary Confinement is torture. Will the Bureau of Prisons finally stop using it? Wash. Post, July 15, 2017; Joe Hernandez, New Jersey considers restricting the use of solitary confinement, The Phila. Tribune, June 7, 2019. Legislation to eliminate or limit solitary has been enacted or proposed in California, Colorado, Connecticut, Hawaii, Nebraska, New Jersey, New York, Tennessee, Virginia, and Washington, D.C. And in fact, several courts of appeals have found long-term solitary confinement violates the Eighth Amendment.

22

I. The Fourth Circuit finds long-term isolation unconstitutional

"The challenged conditions of confinement on Virginia's death row — under which Plaintiffs spent, for years, between 23 and 24 hours a day alone, in a small cell with no access to congregate religious, educational, or social programming — pose a substantial risk of serious psychological and emotional harm." Porter v. Clarke, 923 F.3d 348, 357 (4th Cir. 2019) (internal quotation marks omitted). The Porter Court's ruling was based on "[numerous studies [that] reveal that prolonged detention of inmates in conditions akin to those Plaintiffs faced on Virginia's death row also leads to psychological deterioration, including declines in mental functioning... difficulties in thinking, concentration and memory problems, and problems with impulse control." Id. at 356 (internal quotation marks omitted).

The Plaintiffs in Porter were inmates on Virginia's death row who were housed in conditions similar — but not as restrictive — as Mr. Schulte. Unlike Mr. Schulte, Virginia death row inmates "could keep a television and compact disk player in their cell and borrow approved publications and library materials." Id. at 354. Some inmates were even "allowed out of their cells to perform institutional jobs." Id. They could "request and use wireless telephones any day of the week between 8:00 am and 1:30 pm." Id. Compared to the MDC's concentration camps, Virginia's death row would be heaven. It takes little logical deduction to conclude that, if the least restrictive conditions on Virginia's death row were deemed unconstitutional, it must follow that the MDC's MORE RESTRICTIVE concentration camp must likewise be unconstitutional.

23

In reaching its conclusion, the Fourth Circuit noted that its previous decisions upholding long-term solitary confinement "lacked the benefit of the recent academic literature surveyed by Plaintiffs' experts concerning the harmful psychological and emotional effects of prolonged solitary confinement." Id. at 358. Particularly, "[I]n recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions materially indistinguishable from the challenged conditions..." Id. at 355. "The research, particularly as it relates to special housing units in jails and prisons, has advanced greatly in the last 15 years, furthering the scientific understanding of the harmful effects of solitary confinement and social isolation in these facilities." Id. at 358-59 (quoting Psychology Report).

"Based on this extensive body of literature, scholars have concluded that solitary confinement has potentially serious psychiatric risks." Id. at 356 (citation and quotations omitted). "Scientific research, regardless of methodology, has produced strikingly consistent results: the deprivation of meaningful social contact and positive environmental stimulation characteristic of solitary confinement subjects prisoners to grave psychological and physiological harms." Id. (quoting Amici Brief).

Moreover, the Fourth Circuit noted that the creation of "a substantial RISK of psychological and emotional harm... is sufficient to satisfy an Eighth Amendment violation." Id. at 361. (emphasis in original).

"In sum, the undisputed evidence established... that the challenged conditions of confinement on Virginia's death row created a substantial risk of serious psychological and emotional harm."

24

2. Other Circuits have condemned the use of long-term solitary

The Third Circuit recently reviewed the "robust body of scientific research on the effects of solitary confinement" and found a "scientific consensus" that such confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term... damage." Williams v. Sec'y Penn. Dept of Corr., 848 F.3d 549, 566-67 (3d Cir. 2017). "[R]esearchers find that virtually EVERYONE exposed to such conditions is affected in some way... all will experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli." Id. (emphasis in original). "Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results." Id. "[I]n the absence of interaction with others, an individual's very identity is at risk of disintegration." Id.

The Williams Court found that "[I]n light of the severity of solitary confinement conditions, these troubling findings are hardly counterintuitive...." and that "[T]he results of all these studies are really neither surprising nor novel." Id. at 568. "Now, with the abundance of medical and psychological literature, the 'dehumanizing effect' of solitary confinement is firmly established. "As if psychological damage was not enough, the impact of the deprivation does not always stop there. Physical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation. In addition, the lack of opportunity for free movement

25

is associated with more general physical deterioration. The constellation of symptoms include dangerous weight loss, hypertension, and heart abnormalities, as well as the aggravation of pre-existing medical problems." Id. at 569.

The Tenth Circuit found, after reviewing academic literature, that "solitary confinement even over relatively short periods, renders prisoners physically sick and mentally ill.... These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement." Grissom v. Roberts, 902 F.3d 1162, 1176-77 (10th Cir. 2018) (Lucero, J., concurring).

~~The contrary Supreme Court held that Alguidham~~

The Seventh Circuit has held that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment...., depending on the duration and nature of the segregation and WHETHER THERE WERE FEASIBLE ALTERNATIVES TO THAT CONFINEMENT." Rice ex rel. Rice v. Corr. Medical Svcs., 675 F.3d 650, 666 (7th Cir. 2012) (emphasis added).

3. Long-term solitary confinement has never been applied to non-violent, non-death sentence inmate

Throughout all cases of long-term solitary confinement, it has never been used against someone not on death row, convicted of murder, involved in gangs or violence, or engaged in violence at a prison. In Wilkinson, the Court explained: "[H]arsh conditions may well be necessary and appropriate in light of ~~bring~~ the danger that high-risk inmates pose both to prison officials and to other prisoners...." 542 U.S. at 224. The only time any long-term solitary confinement is contemplated is for crimes of violence where there may exist legitimate penological interests for the lives of others; whether such concerns may overcome the serious detriment of solitary depends upon the conditions of that individual, the duration, and the inmate's threat to others. But here, Mr. Schulte has been convicted of unlawful speech — there is no concern whatsoever of violence. Mr. Schulte is a political prisoner tortured in a concentration camp because the government believes he committed crimes against the government itself.

~~There was no case in their history where the United States was ever violent~~

There is no similar case of a non-violent prisoner convicted of unlawful speech being tortured in similar conditions of confinement; ~~and~~ there is no threat of violence to others as all other courts have required to even consider overriding the Eighth Amendment. "[P]rison officials... may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public..." Porter, 923 F.3d at 363.

27

4. Unreasonable risk of serious and permanent injury or death

"[R]esearch still confirms what this Court suggested over a year ago: Years on end of near-total isolation exact a terrible price." Ayala, 135 S. Ct. at 2210 (Kennedy, J. concurring).

Mr. Schulte's conditions of confinement are worse than any other prisoner in the entire United States. According to the 2019 Time-in-Cell review of solitary confinement across all U.S. prisons, conducted by the Yale Law School's Liman Center, only 5.7% of prisoners have been confined to solitary for 6 years or more like Mr. Schulte, Id. at 12; out of those confined to solitary, 9% had no in-cell programming like Mr. Schulte, 3% had no access to TV, music, internet, or the institution's library, 66% had no access to tablets, id. at 70; 0% had the combination of 6+ years in solitary, no in-cell programming, no TV or access to the library, and severe restrictions on communication including intra-prison, mail, and social. Id.

The Vera Institute of Justice in New York published a cumulative evidence brief titled "The Impacts of Solitary Confinement" by Kayla James and Elena Vanko. "More than 150 years of research in psychiatry, psychology, criminology, anthropology, and epidemiology has documented the detrimental effects of solitary confinement on mental health and well-being." Id. at 1. It notes that "[P]hysical and social isolation, coupled with sensory deprivation and forced idleness, creates a toxic combination associated with a variety of harmful effects, including anxiety, anger, depression, insomnia, impulse control issues, paranoia, hypersensitivity, obsessive thoughts, cognitive disturbances, PTSD, loss of identity, and psychosis." Id. (citation omitted). It observed that psychological harms may worsen the longer someone stays in solitary, and that negative mental health repercussions can be permanent or long-term. Id. at 2.

28

It also observed that the rate of suicide was more than five times higher for people in solitary than in general population; 3.2 times more likely to self-harm; and 78% more likely to die from suicide within the first year after their return to the community. A February 1, 2020 paper published in The Lancet public health journal by Cornell professor Christopher Wildeman do also documented a significant link between solitary confinement and mortality: people placed in solitary for as little as 72 hours were 15 times likelier to die within 5 years of release compared to those never incarcerated.

The Vera report also documented severe neurological effects of solitary including significant changes in electrical activity in the brain; fewer neurons, smaller neurons, decreased connections between neurons, and fewer blood vessels in the brain, id. at 2-3; severe physiological effects such as hypertension, heart attacks, health, insomnia, deterioration of eyesight, sensory hypersensitivity, aggravation of pre-existing medical problems, premature death — including 127% more likely to die m of an opioid overdose in the first two weeks after release;

While it is well-known that solitary exacerbates existing mental illness, those without pre-existing mental illness are "placed at great risk of psychiatric decompensation in solitary confinement.... After controlling for the presence of mental illness, there remains overwhelming evidence that solitary confinement causes many inmates to become suicidal and self-destructive, on average demonstrating that such acts are about seven times more prevalent among those housed in solitary as they are among those housed in general population." Porter at 14-15.

2A

How can solitary confinement - a concept so simplistic it seems benign - possibly inflict such torment? As Elaine Scarry noted in the 1985 book The Body in Pain: The Making and Unmaking of the World, "to have great pain is to have certainty; to hear about pain is to have doubt." For hundreds of years, just as people have voiced great concerns about solitary confinement, ~~because~~ many have held their doubts — including the renowned Dr. Stuart Grassian, who in 1982 expressed serious skepticism about claims of psychological damage related to solitary; but after consulting the research and delving in the modern era of psychological studies into this issue, he was astonished by the results and has ~~been~~ been in the forefront of the academic research — none of which has ever found anything but psychiatric harm — ever since.

The world, however, endured a brief episode - perhaps 1% - of true solitary confinement during the 2020 coronavirus pandemic, thus allowing even more studies into this effect. Research has largely confirmed public surveys conducted during the pandemic showing symptoms of anxiety disorder and/or depressive disorder rose from 10% to 41.1% of the adult population, including tripling of substance abuse & suicidal thoughts; and significant increases in overall feelings of sadness, confusion, fear, grief, insomnia, frustration, isolation, and boredom consistent with studies of solitary confinement. See KFF Health Tracking Poll from July 2020 and Dovepress' Psychological Impact of COVID-19, Isolation, and Quarantine: A cross-sectional study, May 11, 2021.

This worldwide experience, unlike real solitary, had access to the internet, television, telephone, books and reading materials, mail, family, friends, the outside, etc; this provides only a small glimpse into the lives of those in solitary confinement.

It is incontrovertible that the government deprives Mr. Schulte of basic life necessities and places him under conditions of confinement that "pose an unreasonable risk of serious damage to his future health." Helling v. McKinney, 509 U.S. 25, 35 (1993). The substantial risk of serious harm resulting from exposure to the challenged conditions therefore constitute an Eighth Amendment violation and the court must grant the petition for writ of habeas corpus.

"[The prisoner] is led to the cell from which he never again comes forth, until his whole term of imprisonment has expired. He never hears of wife and children; home, or friends; the life or death of any single creature. He sees the prison-officers, but with that exception he never looks upon a human countenance, or hears a human voice. He is a man buried alive; to be dug out in the slow round of years; and in the meantime dead to everything but torturing anxieties and horrible despair." Charles Dickens, American Notes for General Circulation 124.

The United States Federal government is trying to murder Joshua Adam Schulte. It wants him dead and is willing to do anything to achieve its goal. This Court must not permit this murder. The Constitution and basic human rights endowed by our creator compel this Court to deliver Mr. Schulte from the tyranny, oppression, and jaws of death imposed by this immoral government.

3)

## B. Exposure to Extreme Cold

The Second Circuit has "held that an Eighth Amendment Claim may be established by proof that the inmate was subject for a prolonged period to bitter cold." Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001). The government tortures all K-84 inmates by exposing them to the freezing cold— particularly by refusing to heat the unit during the winter. The corrections officers come to work in ski gear while the Concentration Camp slaves are miserably, unbearably freezing cold. This is the very definition of cruel and unusual punishment that is clearly recorded by the cameras in the unit and cages of the concentration camp.

Instead of wasting time arguing the issue back and forth while K-84 inmates are exposed to yet another freezing winter (which as of the previous year typically starts in the fall as the MDC continues to blast the air conditioner at 10,000 %), Mr. Schulte simply requests that the court order the MDC to purchase thermometers with digital display and place them within clear view of the cameras in K-84 the law library and the cages so they can be easily read; thermometers with large digital displays are a dime a dozen and extremely cheap — and any disagreement can be easily referred to the cameras (although the inmates shivering with 3 sets of clothes and multiple blankets should be a dead giveaway regardless). The court should then order the government to properly heat unit K-84 this winter and monitor its progress via the thermometers should the Plaintiff raise an issue.

32

C. Nutritionally Inadequate food.

The Eighth Amendment requires "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and wellbeing of the inmate who consumes it." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983). While the government has been providing Mr. Schulte three meals in the past 6 months, it regularly provides Mr. Schulte with the wrong foods, does not provide enough and does not meet its own menu. See Dkt 30-1 Exhibit A.

All these food issues existed at MCC, were raised to staff who cared enough to find solutions, and then were solved. The MDC staff are unyielding and incompetent — refusing to even listen to the problem; executive staff never make rounds at MDC, and when they do, they go through the motions without announcing their presence or allowing inmates not to speak to them — hence these easy problems are now wasting they this court's time.

1. Wrong Food

Almost every inmate in K-84 is on a specialty diet — kosher, halal, no flesh, etc. and cannot eat each other's food. The trays come unmarked, the officers hand them out at random, and many people can't eat. MCC solved the problem by labeling each tray with a sticky, "NF", "REG", etc. I've requested this same solution to be adopted at MDC for 2 years. MDC refuses. People can't eat.

2. Small Trays

Every general population inmate is served in a hard plastic tray. The K-84 inmates are served in small Styrofoam trays. The quantity of food is vastly different. MCC provided double trays.

33

### 3. Not Meeting own Menu

All general population units are provided loaves of bread from which to ~~em~~ provide inmates bread. MDC used to do this. Then to save costs they started shoving the bread into the small trays, hence when K-84 inmates receive their trays they dont get 3-4 ~~the~~ slices of bread as the menu requires, but one <u>LIQUIFIED</u> and inedible piece of bread. Inmates NEVER get "extras" such as sliced ~~or~~ cheese or condiments as suggested in the menu.

### 4. All evidence easily visible in video footage

The court could easily discern the small amounts of food from K-84 video; that the size of the <sup>regular</sup> trays at MCC and MDC were the same; that the food is unmarked and handed out randomly. MDC staff commit perjury before this court because they know they can do so with impunity — no one has ever held them to account. The court need only review the 24/7 video footage proving Plaintiff's case.

### 5. RELIEF

The government claims Mr. Schulte has never lost weight at MDC — though it never provided its documentation to Mr. Schulte, but at least it cannot be disputed that Mr. Schulte's weight relative to his height is below normal. At the very least, the court should order the government to serve food on K-84 in the same trays as general population, to mark the trays as MCC did, to provide all the "extras" in its menu to K-84 as it does to general population — including bread, AND to either provide double trays as MCC did OR full commissary as general population receives — there would be no issue if Mr. Schulte could simply buy food like peanut butter.

384

D. Sleep Deprivation

Sleep Deprivation is cruel and unusual punishment. The government appears to be voluntarily solving one component of this issue — the constant banging every 30 minutes at night. The government's previous attempt failed as it placed padding on the inside of the slot instead of aligned with the edge which makes contact with the metal frame on the door. But once this is fixed — for both doors of each cage — the issue will be solved.

The 24/7 lights is a separate issue. Essentially, one light remains on at all time. There are two lights in each cage, with two large cylindrical fluorescent bulbs in each, for a total of 4. The light switch disables all 4, and turns on 4 70-watt LED bulbs in one of the lights. This is sufficient light to easily read by and illuminates the entire cage — when the light is flipped off it feels as if only one light has been disabled. So that's 280 watts or 280 J/s. This extreme brightness makes sleep impossible; it can easily be identified in the 24/7 videos of unit K-84.

There is no legitimate reason for the torture lights — they are not installed in general population, the officers can see inside the K-84 cages through the 24/7 nightvision cameras at night, and the night rounds are conducted with flashlights rendering the torture lights irrelevant. ~~Accordingly~~ Moreover, these same lights were removed at MCC, lending weight to their irrelevance. Accordingly, the Court should order the MDC to remove the torture lights.

385

E. Blasting Speakers

Blasting sounds 24/7 constitutes cruel and unusual punishment. It is a form of Sensory Deprivation with no legitimate justification. While not necessarily detrimental at night—Many people use whitenoise machines at night— it is maddening throughout the day (imagine taking the whitenoise machine with you throughout your day). When one cannot even hear one's self think, it becomes detrimental This effectively deprives all sense of sound. The court should order the MDC to disable its torture devices.

36

# FIRST AMENDMENT CHALLENGES

The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1981). The Turner inquiry requires the examination of several factors: (1) whether the policy or regulation is "reasonably related to legitimate penological interests;" (2) whether "there are alternative means of exercising the right that remain open;" (3) "the impact that accommodation of the asserted constitutional right will have on guards and inmates;" and (4) whether "ready alternatives" in prison policy that would accommodate the right exist indicating that the policy is "an exaggerated response to prison concerns." Id. (internal citations and punctuation omitted). Moreover, "[a] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Shakur v. Selsky, 391 F.3d 106, 113 (2d Cir. 2004) (quoting Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (internal punctuation omitted).

A. Freedom of Speech — Communications with others

The government's ban of Mr. Schulte's communications with others is predicated on its desire to prevent Mr. Schulte from communicating classified information — but this is not a penological interest. While the Bureau of Prisons may have justifications to limit speech that may induce violence or jeopardize the security of the institution, it has no authority to safeguard classified information. Congress never granted the Bureau of Prisons authorization to safeguard classified information, and thus has no interest in doing so. See also The Major Questions Doctrine,

38

West Virginia v. EPA, 142 S. Ct. 2587, 2605, 2609 (2022).

And even if safeguarding classified information were a penological interest, the government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." Hess v. Indiana, 414 U.S. 105, 108 (1973). See Bartnicki v. Vopper, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."); Kingsley Int'l Pictures Corp v. Regents of Univ. of N.Y., 360 U.S. 684, 689 (1959) ("Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgement of the rights of free speech.").

Finally, preventing Mr. Schulte from all speech to prevent the potential for unlawful speech fails all four factors of the Turner inquiry: (1) there is no legitimate penological interest in abridging Mr. Schulte's speech; (2) there are no alternatives open to Mr. Schulte; (3) the accommodation of the asserted right will have no impact on prisoners and guards as it is the normal prison rule; and (4) the policy is an exaggerated response to prison concerns.

38

## B. Access to Courts and Mail

The Supreme Court has long recognized that prisoners have a right to meaningful access to the courts and that prison officials are barred from "actively interfering with inmates' attempts to prepare legal documents." Lewis v. Casey, 518 U.S. 343, 350 (1996). "To state a claim for denial of access to the courts... a plaintiff must allege that the Defendant took or was responsible for actions that hindered [the] plaintiff's efforts to pursue a legal claim." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (quotation marks and citations omitted).

The right of access to the courts implies a right to contemporaneous access to be meaningful — receiving Court orders, deadlines, or government letters 30 days late renders all litigation futile. Mr. Schulte consistently has motions denied, cases dismissed, and even appeals dismissed due to the government's deliberate delays of his mail — regularly having to move to reinstate or for reconsideration. See Motion to Compel the MCC to Deliver ALL Court Correspondence and Legal Mail Promptly, U.S. v. Schulte, 17 CR 548, Dkt. 441.

Moreover, there is not even a cognizable justification for delaying Mr. Schulte's incoming mail — he certainly cannot write classified information in mail he RECEIVES. The government's practice of delaying Court correspondence, legal mail, and all incoming mail fails all 4 factors of the Turner inquiry: (1) there is no legitimate penological interest involved; (2) there are no alternatives; (3) accommodation of the right has No impact on prisoners or guards; and (4) the policy is an exaggerated response. Accordingly, the Court should order that all mail sent to Mr. Schulte be given to him the same day and his outgoing legal and court mail to be posted within 48 hours.

389

C. Access to the institution's library

Mr. Schulte has a First Amendment right to access the institution's library and materials as all other prisoners do. There is absolutely no cognizable ~~other~~ justification otherwise, and this practice likewise fails all 4 Turner factors: (1) there is no legitimate penological interest involved; (2) there are no alternatives; (3) accommodation of the right has no impact on prisoners or guards; and (4) the policy is an exaggerated response. Accordingly, the Court should order the MDC to provide Mr. Schulte equal access to the institution's library and resources as provided to other inmates.

D. Access to religious services

Finally, Mr. Schulte has a First Amendment right to access religious services and practice his religion. Once again there is no reasonable justification and the policy fails all 4 Turner factors: (1) there is no legitimate penological interest involved; (2) there are no alternatives; (3) accommodation of the right has no impact on prisoners or guards; and (4) the policy is an exaggerated response. Accordingly, the Court should order the MDC to provide Mr. Schulte equal access to the institution's religious services as provided to other inmates.

40

## VI. CONCLUSION

The United States Federal Government hates Joshua Schulte, and wants to murder him. Thus they have singled him out of the entire prison population and applied torture with only two outcomes — permanent psychological damage and mental illness or death by suicide; the United States will throw a party if either objective is achieved. The Constitution, however, does not permit this.

The United States Federal Government built a concentration camp at MDC, then moved Mr. Schulte into it; the government then imposed 28 CFR § 501.3 conditions against Mr. Schulte despite never being designated as such, in addition to other arbitrary torture. Since Mr. Schulte has a liberty interest not to be designated as a concentration camp slave and tortured, the government was required to follow procedures to ensure procedural due process, but failed to do so; it also failed to periodically review Mr. Schulte's status. As a result, Mr. Schulte's placement violates the Due Process Clause of the Fifth Amendment and he must be removed. Moreover, the government's conditions of confinement are so arbitrary and drastically divergent from the typical prison environment to shock the contemporary conscience and violate substantive due process — which also requires Mr. Schulte's removal from the MDC's concentration camp.

Alternatively, several specific conditions also violate the Eighth Amendment's ban on cruel and unusual punishment. Long-term solitary confinement harsher than imposed upon all death-row inmates in the United States poses an unreasonable risk of serious damage to Mr. Schulte's current and future health; likewise, 24/7 exposure

431

to the extreme cold, nutritionally inadequate food, sleep deprivation, and blasting speakers are all cruel and unusual punishment that the court should order halted forthwith.

Finally, several conditions of confinement violate the First Amendment without any legitimate penological interest, which the court should enjoin.

As a result, the court should grant Mr. Schulte's petition for writ of habeas corpus.


Joshua Alan Schulte


Dated: September 29, 2023
         Brooklyn, NY

Josh Schulte #74471054
MDC
P.O. Box 324002
Brooklyn, NY 11232

ATTN: Schulte v. Warden, MDC, 22-CV-766
Pro Se Intake Office
U.S. District Court EDNY
225 Cadman Plaza East
Brooklyn, New York 11201

