# Exhibit 2



U.S. Department of Justice

Criminal Division

Office of the Assistant Attorney General  Washington, D.C. 20530

<u>LIMITED OFFICIAL USE</u>

MEMORANDUM

TO: Colette S. Peters
Director
Federal Bureau of Prisons

FROM: Jennifer A.H. Hodge
Deputy Assistant Attorney General

*Digitally signed by JENNIFER HODGE Date: 2023.10.19 11:51:11 -04'00'*

SUBJECT: Extension of Special Administrative Measures Pursuant to 28 C.F.R. § 501.2 for Federal Bureau of Prisons Inmate Joshua Adam Schulte

## SUMMARY

The current Special Administrative Measures (SAM) for Federal Bureau of Prisons (BOP) inmate Joshua Adam Schulte expire on October 26, 2023. The United States Attorney for the Southern District of New York (USA/SDNY), the Central Intelligence Agency (CIA), the Counterintelligence and Export Control Section of the National Security Division (CES/NSD), and the Federal Bureau of Investigation (FBI) jointly request and recommend that SAM be renewed. The Director of the CIA has certified, pursuant to 28 C.F.R. § 501.2, that the implementation of SAM is reasonably necessary to prevent disclosure of classified information by Schulte, and that the disclosure of such information would pose a threat to the national security. Schulte was convicted at trial in the Southern District of New York of criminal counts concerning his unauthorized accessing, theft, and disclosure of classified information, as well as making false statements to the FBI. As detailed below, the inmate has demonstrated a commitment to share classified national security information, the release of which would be harmful to the national security of the United States. The Office of Enforcement Operations (OEO) concurs with the recommendations of the USA/SDNY, CIA, CES/NSD, and FBI, and recommends that the SAM be renewed for a period of one year.

## PROCEDURAL HISTORY

On October 31, 2018, Schulte was charged in a superseding indictment in the Southern District of New York that alleged unlawful theft and transmittal of classified information from the CIA; unlawful disclosure and attempted disclosure of classified information from the

Metropolitan Correctional Center (MCC); unauthorized accessing of CIA computer systems and theft of classified information from therein; making false statements to the FBI during its investigation; and the willful violation of a protective order. In March 2020, Schulte was tried and convicted of making false statements and violating a protective order, in violation of 18 U.S.C. §§ 401(3) and 1001; however, regarding the other offenses, the Government dismissed one charge and a mistrial was declared regarding the others.

In June 2020, Schulte was charged in the Southern District of New York in a nine-count superseding indictment with (1) four counts of violating 18 U.S.C. § 793, in connection with his 2016 unlawful theft and transmittal of classified information from the CIA and his 2020 unlawful disclosure and attempted disclosure of classified information from the MCC; (2) four counts of violating 18 U.S.C. § 1030, in connection with Schulte's unauthorized accessing and manipulation of CIA computer systems and theft of classified information from therein; and (3) one count of violating 18 U.S.C. § 1503, in connection with false statements Schulte made to the FBI during its investigation. On July 13, 2022, Schulte was convicted on all nine counts. However, in August 2023, the court granted defendant's motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure to acquit Schulte of the charge of violating 18 U.S.C. § 1503. The court rejected the motion as to the other eight counts of conviction. On September 13, 2023, Schulte was convicted on charges of receiving, possessing, and transporting child pornography in violation of 18 U.S.C. § 2252A. Sentencing on all above remaining counts of conviction is scheduled for January 10, 2024, and Schulte is currently being held at the BOP's Metropolitan Detention Center in Brooklyn, New York (MDC Brooklyn).

## FACTUAL SUMMARY

Schulte is a native of Texas who graduated from the University of Texas at Austin with a degree in Computer Engineering. Schulte worked most recently as a Senior Software Engineer at Bloomberg in New York. Previously, he worked as a software engineer at IBM from 2008-2009 and as an intern at the National Security Agency (NSA) in 2010. Schulte was employed by the CIA from approximately 2010 to November 2016.

During his time at the CIA, Schulte was assigned to a specific group within the CIA (CIA Group) that is responsible for various computer-engineering activities, including the development of tools for CIA operators. The CIA Group maintained classified information on an isolated local-area network (LAN). Access to the LAN, on which the classified information was stored, was limited to employees of the CIA Group (approximately 200 people at the time Schulte stole the classified information in question in 2016). Schulte was engaged in developing and managing computer tools that the CIA used to support operations around the globe, and as part of his job, had access to highly classified national defense information.

Between March and November 2017, WikiLeaks.org ("WikiLeaks") made 26 separate publications of classified information, disclosing over 8,000 documents and files (hereinafter, the Leak) that contain highly sensitive and valuable national security-related information including, among other things, detailed descriptions of the tools used by CIA operators in the field and the names and/or pseudonyms of multiple CIA employees. The USA/SDNY reports that the Leak is one of the largest unauthorized disclosures of classified material in CIA history and has had a substantially damaging impact on national security. The CIA determined that the Leak was catastrophic and debilitating to its operational capabilities and has hindered the Government's ability to ensure national security. Moreover, the CIA had to discontinue many of the tools compromised in the Leak in order to protect sources and methods.

Following the WikiLeaks disclosures, subsequent investigation by the CIA and FBI determined that in 2016, Schulte used his access to the LAN to steal classified information and later transmit it to WikiLeaks. In doing so, Schulte flagrantly disregarded security protocols and engaged in unauthorized and illegal activities by, among other things, granting himself administrative privileges to the LAN for the purpose of stealing the classified information, changing others' privileges, and erasing logs of his activities. Schulte also demonstrated the intent and ability to disclose classified information to the public as an act of retaliation against the CIA for perceived wrongs against him. Specifically, the USA/SDNY reports that Schulte claimed that another employee threatened his life and reported the alleged threat to his supervisors at the CIA, who investigated and ultimately found his complaint to be without merit. Schulte believed that CIA management did not take his concerns seriously.

Schulte was initially arrested on August 24, 2017, in connection with child pornography charges. At the time of his arraignment on September 13, 2017, the court granted Schulte bail, imposing strict conditions to include home incarceration with electronic monitoring and prohibition on the use of computers or the Internet, except where expressly authorized by Pretrial Services. Nevertheless, Schulte violated the Court's bail conditions by using the Internet without authorization while on pretrial release. For example, data obtained from the service provider for Schulte's email account indicated that following Schulte's release on bail, his email account was regularly logged into and out of, most recently on the evening of December 6, 2017. The Internet Protocol (IP) address used to access his email account was almost always the IP address associated with the broadband Internet account for Schulte's apartment—*i.e.*, the account used by Schulte in the apartment to access the Internet via a Wi-Fi network.

In addition, data from Schulte's broadband account indicated that on November 16, 2017, that account was used to access the Onion Router (TOR) network, which allows for anonymous communications on the Internet via a worldwide network of linked computer servers and multiple layers of data encryption. The broadband account showed that several additional TOR connections were made between November 17 and December 5, 2017. This conduct is particularly troubling, as TOR networks can be used to anonymously transfer encrypted data on

the Internet, and there is evidence that Schulte had previously used TOR networks to facilitate his transfer of the classified information to WikiLeaks.

On January 8, 2018, Judge Crotty of the U.S. District Court for the Southern District of New York ordered Schulte's detention, based upon a determination that Schulte had violated his bail conditions by using the Internet without authorization and was a danger to the community.

In addition to violating his bail restrictions, Schulte also violated a protective order governing production of discovery in his case, which the court had imposed based upon a determination that a protective order was necessary to protect materials that, if disseminated to third parties, could jeopardize national security and the safety of others, as well as impede ongoing investigations. The order provides that materials designated pursuant to the order are to be used by Schulte and his counsel solely for the purpose of preparing a defense to the charges against him and limits disclosure of those materials by Schulte and his counsel to a limited set of individuals, specifically identified in the protective order, who have been determined to be necessary for Schulte's defense. Schulte, through counsel, agreed to be bound by the protective order. The Government subsequently produced several search warrant affidavits subject to the protective order.

On May 15, 2018, *The Washington Post* and *The New York Times* published articles that discussed in detail the protected search warrant affidavits. A subsequent review by law enforcement of Schulte's recorded prison calls determined that he was responsible for providing the protected affidavits (or the information contained in the affidavits) to the media in violation of the protective order. Schulte can be heard on recorded prison calls discussing the contents of the protected affidavits with third parties, including individuals who appeared to be reporters, and even acknowledged on the calls that the affidavits were subject to the protective order.

The FBI and the trial court determined that Schulte had made at least four unauthorized disclosures of classified information. First, in April 2018, in a prison call with a reporter, Schulte disclosed the identities of current CIA officers, some of whom were undercover. Second, during a court appearance on June 28, 2018, Schulte submitted to the court a 138-page *pro se* handwritten motion seeking bail. Immediately following the court appearance, the USA/SDNY notified defense counsel that Schulte's bail motion might contain classified information. A subsequent classification review determined that the motion did in fact contain classified information relating to the CIA. Third, despite having been warned that his bail motion could contain classified information, Schulte mailed the motion to an attorney in Texas whom he was soliciting to assist on his case and also provided a copy to his parents. Fourth, in September 2021, Schulte filed a public motion that the court subsequently found contained classified information. The court subsequentlu removed the document from the public docket.

Additionally, while detained at the MCC, and prior to imposition of the SAM, Schulte and other inmates arranged to have cellphones illegally smuggled into the prison for their use. Schulte coordinated his activities with other inmates, often using them to obtain or store the contraband cellphones and using the cellphones to pass messages covertly to other inmates. Schulte also used the contraband cellphones to create encrypted email and electronic communications accounts, which he used to transmit and attempt to transmit additional classified information, and to access and post messages via social media.

Based upon information provided to me, including Schulte's theft and disclosure of classified information to WikiLeaks, his violation of the court's protective order, and his continued willingness to disclose classified information, even while incarcerated, I find that there is a danger that Schulte will disclose classified information, the unauthorized disclosure of which would pose a threat to the national security of the United States, and that SAM on Schulte are reasonably necessary to prevent disclosure of such information. Therefore, I am requesting that you, pursuant to 28 C.F.R. § 501.2, implement SAM to restrict Schulte's access to the mail, the media, the telephone, and visitors. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to my further direction.

1.  **General Provisions**

    a.  **Adherence to Usual USMS, BOP, and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

    b.  **Interim SAM Modification Authority -** During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

        i.   Does not create a more restrictive SAM;

        ii.  Is not in conflict with the request of the USA/SDNY, FBI, CIA, or USMS/BOP/DF, or applicable regulations; and

        iii. Is not objected to by the USA/SDNY, FBI, CIA, or USMS/BOP/DF.

    c.    **Inmate Communications Prohibitions** - The inmate is limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) classified information.

2.    **Attorney-Client Provisions**

    a.    **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The inmate's attorney (or counsel) -- individually by each if more than one -- must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, the inmate's attorney and precleared staff[2] acknowledge the restriction that they will not forward third-party messages to or from the inmate.

        i.    The USA/SDNY shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/SDNY, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his or her individual capacity.

[2] "Precleared," when used with regard to an interpreter/translator, refers to an interpreter/translator who is actively assisting the inmate's attorney with the inmate's criminal and/or civil proceedings in which the attorney represents the inmate, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed -- as evidenced by his or her signature -- to adhere to the SAM restrictions and requirements.

      ii.      After initiation of the SAM and prior to the inmate's attorney being permitted to have attorney-client privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/SDNY.

      iii.     The USA/SDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

b.    **Attorney-Client Privileged Visits -** Attorney-client privileged visits may be contact or non-contact, at the discretion of the USMS/BOP/DF.

c.    **Attorney and Precleared Staff May Disseminate Inmate Conversations** – The attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of providing necessary legal services related to the inmate's criminal and/or civil proceedings in which the attorney represents the inmate -- and not for any other reason -- on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff

d.    **Attorney's Unaccompanied Precleared Paralegal(s) May Meet With Client -** The inmate's attorney's precleared paralegal(s) may meet with the inmate without the need for the inmate's attorney to be present. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

e.    **Simultaneous Multiple Legal Visitors -** The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF. An investigator may not meet alone with the inmate.

f.    **Legally Privileged Telephone Calls -** The following rules refer to all legally privileged telephone calls or communications:

      i.      **Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls** - The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

    ii. **Inmate's Initiation of Legally Privileged Telephone Calls** - Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

        (1) The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

        (2) The inmate's attorney must instruct his or her staff that:

            (a) The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

            (b) The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls, or any other communications, to third parties.

        (3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

            (a) Is to be overheard by a third party.[3]

            (b) Will be patched through, or in any manner forwarded or transmitted, to a third party.

            (c) Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.c. above.

---

[3] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney-client privileged communications.

    (d)  Shall be in any manner recorded or preserved.[4] The inmate's attorney may make written notes of attorney-client privileged communications.

  (4)  If the USMS/BOP/DF, FBI, CIA, or USA/SDNY determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

g. **Documents Provided by Attorney to Inmate -** During a visit, the inmate's attorney may provide the inmate with, or review with the inmate, documents related to the criminal and/or civil proceedings in which the attorney represents the inmate, and/or material prepared by the inmate's attorney related to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any documents not related to the inmate's criminal and/or civil proceedings in which the attorney represents the inmate must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2.i. and 3.g. Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

  i. None of the materials provided may include inflammatory materials, materials relating to the dissemination of classified information, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/SDNY and FBI.

  ii. The USA/SDNY may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document may be obtained from the USA/SDNY without the need to formally seek approval for an amendment to the SAM.

---

[4] Except by the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities. This section does not allow monitoring of attorney-client privileged communications.

    h.    **Legal Mail**[5] **-** The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail (legal or otherwise), or any portion of its contents, to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to the inmate's criminal

and/or civil proceedings in which the attorney represents the inmate -- and not for any other reason.

In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that the attorney and his or her staff are strictly prohibited from forwarding third-party mail to or from the inmate.

3.    **Inmate's Non-legal Contacts**

    a.    **Non-legally Privileged Telephone Contacts -**

        i.    The inmate is only authorized to have non-legally privileged telephone calls with his immediate family members.[6]

        ii.    The quantity and duration of the inmate's non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

    b.    **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.    Is to be overheard by a third party.

        ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

---

[5] "Legal mail" is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[6] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF-, or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

        iii.       Shall be divulged in any manner to a third party.

        iv.       Shall be in any manner recorded or preserved.[7]

        All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

   c.     **Telephone SAM Restriction Notifications -** For all non-legally privileged telephone calls to the inmate's immediate family member(s):

        i.       The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

        ii.       The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions. The USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

        iii.       The USMS/BOP/DF shall document each such telephone notification.

   d.     **Family Call Monitoring -** All calls with the inmate's immediate family member(s) may be:

        i.       Contemporaneously monitored by the FBI.

        ii.       Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging the disclosure of classified information or other crimes, or to otherwise attempt to circumvent the SAM.

        iii.       A copy of each telephone call recording involving an inmate/immediate family member/authorized contact shall be provided to the FBI and/or the CIA by the USMS/BOP/DF. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

---

[7] Except by the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities.

 e. **Improper Communications -** If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of the disclosure of classified information, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

 f. **Non-legal Visits -**

  i. **Limited Visitors -** The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

  ii. **English Requirement -** All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF-, and/or FBI- - approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

  iii. **Visit Criteria -** All non-legal visits may be:

   (1) Contemporaneously monitored by the USMS/BOP/DF, FBI, and/or the CIA in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging the disclosure of classified information or other crimes, or to otherwise attempt to circumvent the SAM.

   (2) Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

   (3) Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff.

   (4) Limited to one adult visitor at a time. However, the FBI-verified children of the inmate may visit with a pre-approved adult visitor.

    g.    **Non-legal Mail** - Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). In addition to non-legal mail from the inmate's attorney, as discussed in subparagraph 2.h. above, non-legal mail is only authorized with the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities.

        i.    **General correspondence with limitations -** Correspondence is only authorized with immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI.

        ii.    **General correspondence without limitations -** There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution; the public; or national security; may be jeopardized.

        iii.    All non-legal mail shall be -

            (1)    **Copied -** Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which the inmate is housed.

            (2)    **Forwarded -** Shall be forwarded, in copy form, to the location designated by the FBI.

            (3)    **Analyzed -** After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail shall be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming), or directly to the addressee (outgoing).

    iv.    The federal government shall forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

        (1)    A reasonable time not to exceed fourteen (14) business days for mail that is written entirely in the English language.

        (2)    A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

        (3)    A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

    v.    **Mail Seizure -** If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI and/or the CIA to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging the dissemination of classified information, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI and/or the CIA for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.    **Communication With News Media**

The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5.    **Religious Visitation**

If a USMS/BOP/DF- and/or FBI-approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells**

    a.    The inmate shall not be allowed to share a cell with another inmate.

    b.        The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

7.       **Cellblock Procedures**

    a.        The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

    b.        The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.       **Access to Mass Communications**

To prevent the inmate from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

    a.        **Publications/Newspapers -**

        i.        The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/SDNY. The inmate may correspond with the publishing company regarding technical aspects of the publication, i.e., availability of particular volumes, billing questions, etc. The review of this correspondence will be in accordance with section 8(a)(iii), below.

        ii.       Sections of any publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to the inmate.

        iii.      If restricted by the USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations

        are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

        iv.    In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

   b.   **Television and Radio -** The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

   c.   **Termination or Limitation** - If the USMS/BOP/DF determines that mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of criminal activities or in violation of the SAM, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

9.   **Access to Books**

The inmate may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's and/or the CIA's expertise is required, the book(s) will be forwarded to the FBI and/or the CIA for review. In conducting its analysis, the FBI and/or the CIA will determine whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates.

10.   **Transfer of Custody**

In the event that the inmate is transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for this inmate shall continue in effect, without need for any additional DOJ authorization.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent the inmate from revealing classified information. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to divulge such classified information.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of calls to others in which classified information may be disclosed.

With respect to mail privileges, the SAM are reasonably necessary to prevent the inmate from receiving or transmitting classified information. Accordingly, I have weighed the inmate's interest in the timely receipt and/or submission of mail, with the possible danger the contents of the mail may pose to national security. I have determined that delaying mail delivery to allow authorized personnel to examine a copy of the mail is the least restrictive means available to ensure that the mail is not being used to communicate any classified information.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk of disclosure of classified information. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate attempts to disclose classified information to justify such media restrictions.

The SAM's limitations on access to mass communications are reasonably necessary to prevent the inmate from receiving and transmitting classified information or information coded in a potentially undetectable manner. Such messages may be placed in advertisements or communicated through other means, such as television and/or radio. I believe that limiting and/or delaying media access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that threatens the national security.

**SAM CONTACT INFORMATION**

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 900, Washington, D.C. 20530-0001; and telephone (202) 514-6809.