# BELDOCK LEVINE & HOFFMAN LLP
## 99 PARK AVENUE, PH/26TH FLOOR
## NEW YORK, N.Y. 10016

JONATHAN MOORE
DAVID B. RANKIN
LUNA DROUBI
MARC A. CANNAN
CYNTHIA ROLLINGS
JONATHAN K. POLLACK
HENRY A. DLUGACZ
STEPHEN J. BLUMERT
MYRON BELDOCK (1929-2016)
LAWRENCE S. LEVINE (1934-2004)
ELLIOT L. HOFFMAN (1929-2016)

TEL: (212) 490-0400
FAX: (212) 277-5880
WEBSITE: blhny.com

COUNSEL
BRUCE E. TRAUNER
PETER S. MATORIN
KAREN L. DIPPOLD
MARJORY D. FIELDS
EMILY JANE GOODMAN
(JUSTICE, NYS SUPREME COURT, RET.)
FRANK HANDELMAN

REF: 899.701

WRITER'S DIRECT DIAL:
**(212) 277-5820**
**kstephan@blhny.com**

January 16, 2024

**VIA ECF**

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *Schulte v. Warden of MDC*, **22-CV-766 (E.D.N.Y.)**
             **Response to Government's January 9, 2024 Submission**

Dear Judge Komitee:

      This letter responds to the Government's January 9, 2024 submission in this case. (Dkt. 58-1.) The Government simply has not met its burden under 28 C.F.R. § 501.2 to demonstrate that (1) the 2023 special administrative measures ("SAMs") imposed on Mr. Schulte are "reasonably necessary to prevent disclosure of classified information," (2) "the unauthorized disclosure of [the classified] information would pose a threat to the national security," and (3) "there is a danger that [Mr. Schulte] will disclose [that classified] information." 28 C.F.R. § 501.2.

      The majority of the Government's January 9, 2024 letter discusses Mr. Schulte's time at the CIA, disclosure to Wikileaks, convictions, and the imposition of the 2018 SAMs. (*See* Dkt. 58-1 at 1–5, 7–10.)

      Nowhere in the letter does the Government claim that Mr. Schulte has access to classified information in the form of documents or electronic files, but only by what he allegedly knows. Accordingly, the Government appears to concede that Mr. Schulte no longer has access to classified information as a part of his criminal case.

      As far as the undersigned can tell, the Government's January 9, 2024 letter points only to the following to suggest that Mr. Schulte might still know classified information that, if disclosed,

would be damaging to national security:

> (1) 2018 writings by Mr. Schulte stating that he would wage an "information war" against the United States and knew information that would be damaging to national security. (Dkt. 58-1 at 6.)
>
> (2) Draft tweets from 2018 that allegedly contained classified information. (Dkt. 58-1 at 7 & n.5.)
>
> (3) A January 2023 filing in which Mr. Schulte stated that he retains information that would be damaging to national security. (Dkt. 58-1 at 10.)
>
> (4) A 2023 filing in which Mr. Schulte said that denying him access to a sensitive compartmentalized information system ("SCIF") would require him to write classified information in a less secure manner. (Dkt. 58-1 at 10.)
>
> (5) A 2022 stipulation stating that Mr. Schulte remained aware of national security information beyond what he had disclosed that, if disclosed, would be damaging to national security. (Dkt. 58-1 at 1, 10–11.)
>
> (6) That Mr. Schulte knows the true identity of undercover CIA officers "with whom he used to work." (Dkt. 58-1 at 11.)

None of those points satisfy the Government's burden under 28 C.F.R. § 501.2. In this letter, counsel will (a) briefly discuss each point in turn, and (b) briefly reply to some of the Government's arguments about Mr. Schulte's conditions of confinement that are not authorized by the SAMs, which were not discussed at the December 18, 2023 oral argument.

### A. The Government's Arguments in Support of the 2023 SAMs

#### 1. Mr. Schulte's 2018 Writings

The Government notes that Mr. Schulte wrote articles around August 2018 stating that he would wage an "information war" and claiming that he had information that would be damaging to national security. (Dkt. 58-1 at 6.) These writings do not satisfy the Government's burden under 28 C.F.R. § 501.2 for several reasons.

First, regardless of what Mr. Schulte says, the Government has the burden to demonstrate that Mr. Schulte actually knows classified information, the unauthorized disclosure of [which] would pose a threat to the national security." 28 C.F.R. § 501.2. Despite being given this opportunity to do just that, the Government simply has not shown this Court any classified information that Mr. Schulte still knows, let alone how unauthorized disclosure of that information would pose a threat to national security.[1] Mr. Schulte's bald assertion that he knows such

---

[1] When the undersigned consented to the Government filing a non-classified submission in

information cannot be sufficient to justify the kind of deprivation of liberty at issue here. The Government must meet its burden.

In addition, even if Mr. Schulte knew information that satisfied 28 C.F.R. § 501.2 when he wrote the 2018 articles, the Government has not demonstrated how that information still satisfies 28 C.F.R. § 501.2 now—almost six years later. As this Court pointed out at the December 18, 2023 oral argument, with respect to any classified information that Mr. Schulte may have known from his time at the CIA (which ended nearly eight years ago): (1) Mr. Schulte may have forgotten it; and (2) "the sensitivity of that information may have dissipated over time" and thus "may be stale and not necessarily any true national security risk at this point." (Dec. 18, 2023 Transcript ("Tr."), Dkt. 56, at 20.) The Government simply has not shown that any information that Mr. Schulte learned during his time at the CIA satisfies 28 C.F.R. § 501.2.

Indeed, testimony elicited by the Government at trial suggests that everything that Mr. Schulte worked on during his time at the CIA had to be completely scrapped because of his disclosures. (Trial Transcript, *United States v. Schulte*, 17-CR-548 (S.D.N.Y.), ECF No. 361 at 353–53 (Mr. Schulte's colleague testifying that all of their past work was dead and none of it was "operationally usable"), ECF No. 371 at 1512 (another of Mr. Schulte's colleagues testifying that the disclosure destroyed all of their work and none of it could ever be used again).) Even the Government's January 9, 2024 submission cites to similar testimony in order to paint Mr. Schulte's leaks as particularly devastating to national security. (Dkt. 58-1 at 5.[2])

Accordingly, pointing to Mr. Schulte's 2018 writings does not satisfy the Government's burden under 28 C.F.R. § 501.2.

### 2. Mr. Schulte's 2018 Tweets

The Government notes that Mr. Schulte drafted tweets in August and September 2018 that allegedly contained "classified information about other CIA operations, the particulars of which remain classified, and which were not derived from classified discovery or the WikiLeaks Disclosures." (Dkt. 58-1 at 7 & n.5.)

Once again, however, the Government has not shown this Court what that information is, let alone how its disclosure "would pose a threat to the national security." 28 C.F.R. § 501.2. In

---

response to the December 18, 2023 oral argument, counsel noted that the Government's plan likely would not satisfy the Court's order show the Government what information Mr. Schulte retains that satisfies 28 C.F.R. § 501.2. (Email available upon request.) Should the Court agree that the Government has not met its burden, the undersigned respectfully requests that the Government not be given a third bite at the apple, especially given Mr. Schulte's impending sentencing and likely transfer.

[2] Mr. Schulte has also stated that he never planned to publish these articles. (*See* Partial Motion to Dismiss, *United States v. Schulte*, 17-CR-548 (S.D.N.Y.), ECF No. 597, at 9–12.)

fact, the Government does not even assert in its papers that this information "would pose a threat to the national security." 28 C.F.R. § 501.2.

Even assuming the information in the tweets would have posed "a threat to the national security" if disclosed in 2018 when they were drafted, the Government has not demonstrated that they would still "pose a threat to national security" if disclosed now, as the Court suggested the Government needed to do in the December 18, 2023 oral argument. (Dec. 18, 2023 Transcript ("Tr."), Dkt. 56, at 20.)

Indeed, as discussed above, testimony elicited at trial suggest that nothing Mr. Schulte learned while at the CIA (nearly eight years ago now) could still be damaging to national security. (Trial Transcript, *United States v. Schulte*, 17-CR-548 (S.D.N.Y.), ECF No. 361 at 353–53, ECF No. 371 at 1512; Dkt. 58-1 at 5.[3])

Accordingly, pointing to Mr. Schulte's 2018 tweets does not satisfy the Government's burden under 28 C.F.R. § 501.2.

### 3. **<u>Mr. Schulte's January 2023 Filing</u>**

The Government notes that, in a January 2023 filing, Mr. Schulte stated the he retains information that, if disclosed, would be damaging to national security. (Dkt. 58-1 at 10.)

Once again, however, Mr. Schulte stating it does not make it so. The burden is on the Government to demonstrate that Mr. Schulte actually retains information that is still classified and would still, if disclosed, be damaging to national security—and the Government has not met that burden. As discussed above, the Government has not (1) pointed the Court to any piece of classified information that Mr. Schulte still knows; (2) demonstrated how such information, if disclosed, would be damaging to national security; (3) reckoned with the fact that such information would now be nearly eight years old and thus almost certainly stale and no longer a threat to nationals security; or (4) addressed the testimony elicited at trial suggesting that everything that Mr. Schulte worked on while at the CIA was scrapped.

Accordingly, pointing to Mr. Schulte's January 2023 filing does not satisfy the Government's burden under 28 C.F.R. § 501.2.

### 4. **<u>Mr. Schulte's 2023 Filing About the SCIF</u>**

The Government points out that, in a May 2023 filing, Mr. Schulte wrote that, "if the Court prevents Mr. Schulte from using the SCIF to write potentially classified information or from bringing his material to be reviewed by standby counsel in the SCIF, then the protective order is

---

[3] It is also the undersigned's understanding that these tweets were actually declassified for trial, so the information in them should no longer be a basis for the imposition of SAMs. (*See* Partial Motion to Dismiss, *United States v. Schulte*, 17-CR-548 (S.D.N.Y.), ECF No. 597, at 28–29).)

essentially null and void—and neither the court nor the government can blame or take action against Mr. Schulte for any incidental disclosure of classified information." (Dkt. 58-1 at 10.)

Again, for the reasons detailed in Points 1 through 4 above, Mr. Schulte's own suggestion in this filing that he still knows classified information cannot possibly satisfy the Government's burden to demonstrate that he actually knows classified information—nearly eight years after working for the CIA—that, if disclosed, would still be damaging to national security, despite the testimony elicited at trial.

Furthermore, there is an irony to the Government pointing to this filing as evidence that 28 C.F.R. § 501.2 is satisfied. In the filing, Mr. Schulte is clearly seeking access to the SCIF so that he can abide by the protective order and avoid incidentally disclosing classified information. That, if anything, cuts against an argument that "there is a danger that [Mr. Schulte] will disclose [the classified] information" he is allegedly privy to. 28 C.F.R. § 501.2

Accordingly, pointing to Mr. Schulte's 2023 filing about the SCIF does not satisfy the Government's burden under 28 C.F.R. § 501.2.

### 5. The 2022 Stipulation

The Government points to a stipulation signed by Mr. Schulte and the Government at trial in 2022 stating that Mr. Schulte "remains aware of sensitive national defense information beyond what he is charged with disclosing or attempting to disclose … , the disclosure of which would be extremely damaging to national security." (Dkt. 58-1 at 10–11.)

That stipulation emerged from Mr. Schulte's unsuccessful attempt to argue that, by disclosing what he had, he clearly did not intend to disclose information that would be damaging to national security because he knew information that would be more damaging to national security and did not disclose that. (Decision and Order, *United States v. Schulte*, 17-CR-548 (S.D.N.Y), ECF No. 825, at 18–21.)

Accordingly, this stipulation, like the other pieces of evidence pointed to by the Government, amounts to nothing more than a bald assertion by Mr. Schulte that he knows classified information that, if disclosed, would be damaging to national security.

Despite the stipulation, the Government still has not shown this Court what information the stipulation refers to, and thus how it satisfies 28 C.F.R. § 501.2, especially given the length of time since Mr. Schulte has worked at the CIA and the testimony elicited at trial suggesting that everything Mr. Schulte worked on while at the CIA has been scrapped, as discussed above.

The degree of deprivation of liberty at issue here cannot be justified by such an unusual and ambiguous stipulation, without any additional evidence about what classified information it refers to, or how disclose of that information would be damaging to national security.

Accordingly, pointing to the 2022 stipulation does not satisfy the Government's burden

under 28 C.F.R. § 501.2.

### 6. The Identity of Undercover CIA Agents

The Government points out that Mr. Schulte "remains aware of the true identities of undercover CIA officers with whom he worked." (Dkt. 58-1 at 11.) This point fails to satisfy 28 C.F.R. § 501.2 for at least three reasons.

First, aside from pointing to unrelated cases, the Government has not shown the Court how disclosure of the identity of *these* CIA officers' identities "would pose a threat to the national security." 28 C.F.R. § 501.2. Given the extreme deprivation of liberty at issue here, merely pointing out that Mr. Schulte knows the identity of some undercover CIA officers—without more—cannot be sufficient.

Second, as the Government states, Mr. Schulte has known the true identities of these undercover CIA officers since he worked with them—nearly eight years ago. (Dkt. 58-1 at 11.) Mr. Schulte has not worked at the CIA since late 2016. The SAMs were not first imposed until late 2018. (Dkt. 58-1 at 11.) And the Government has not alleged that Mr. Schulte disclosed or attempted to disclose the identity of these CIA officers before or after imposition of the SAMs. The Government has thus failed to demonstrate that "there is a danger that [Mr. Schulte] will disclose" the identity of these CIA officers. 28 C.F.R. § 501.2.

Third, the implication of this point justifying an imposition of SAMs is untenable. If Mr. Schulte's knowledge of the true identities of these undercover CIA officers justifies the continued imposition of SAMs, it is unclear when the SAMs would no longer be justified—if ever. It would be incumbent on the Government to come forward and state that the information no longer poses a threat to national security—a complete reversal of the 28 C.F.R. § 501.2 standard.[4]

Accordingly, pointing to Mr. Schulte's knowledge of the true identity of unidentified CIA officers does not satisfy the Government's burden under 28 C.F.R. § 501.2.

### 7. Conclusion

For all of the reasons explained above, nothing that the Government points to in its January 9, 2024 submission satisfies its burden to demonstrate that (1) the 2023 SAMs imposed on Mr. Schulte are "reasonably necessary to prevent disclosure of classified information," "the unauthorized disclosure of [the classified] information would pose a threat to the national security," and "there is a danger that [Mr. Schulte] will disclose [the classified] information." 28

---

[4] This point applies to all of the Government's arguments that Mr. Schulte must be kept in SAMs simply because of what he knows. If what Mr. Schulte knows justifies the imposition of SAMs, without any temporal limitation, the SAMs would appear to be justified as long as Mr. Schulte lives—a position that cannot possibly be constitutional.

C.F.R. § 501.2.[5]

### B. Mr. Schulte's Non-SAMs Conditions of Confinement

In its December 8, 2023 submission, the Government argued that none of Mr. Schulte's conditions of confinement that are not authorized by the SAMs violate the law. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3.) The December 18, 2023 oral argument focused largely on whether the SAMs were still justified, and thus the undersigned did not have a chance to respond to the Government's December 8, 2023 arguments. Accordingly, counsel respectfully submits the following, brief reply to some of the Government's arguments about Mr. Schulte's conditions of confinement that are not authorized by the SAMs.

### 1. Illumination

The Government argues that the constant illumination in Mr. Schulte's cell is lawful. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 15–16.) For that proposition, the Government cites no controlling cases. Indeed, the Government does not cite a single case from within the Second Circuit. Within the Second Circuit, however, courts have found that plaintiffs have stated Eighth Amendment violations where they have alleged that they "suffered periods of 24-hour illumination of [their] prison cell, which resulted in headaches, eye problems, depression, and the inability 'to sleep for close to two weeks.'" *Abreu v. Farley*, No. 11-CV-06251 (EAW), 2019 U.S. Dist. LEXIS 42801, at *58 (W.D.N.Y. Mar. 15, 2019). Those facts are materially similar to the facts of this case.[6]

In addition, in discussing the constant illumination, the Government invokes *Turner v. Safley*, 482 U.S. 78, 89 (1987), to argue that the illumination is "reasonably related to legitimate penological interests." (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 16.) *Turner*, however, does not apply to Eighth Amendment claims. *Johnson v. California*, 543 U.S. 499, 511 (2005) ("[W]e have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison. We judge violations of that Amendment under

---

[5] At the December 18, 2023 Oral Argument, the Court expressed a concern that there appeared to be some "inertia" behind the SAMs and that they were "re-authorizing themselves," without careful review. (Tr., Dkt. 56, at 18–19.) Petitioner notes that the Government's failure to update the SAMs to conform to Judge Crotty's October 6, 2021 Order is evidence of just that. (Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 15–16.)

[6] At the September 5, 2023 evidentiary hearing in this case, Officer Bullock testified that he was not aware of any other people in the SAMs unit complaining about the constant illumination, but also testified that he knew that all of the people incarcerated in the SAMs unit shoved their jumpsuits over the lights in their cells during the night, creating a serious credibility issue as to all of his testimony. (*See* Transcript of Sept. 5, 2023 Evidentiary Hearing, Dkt. 34, at 90.)

the 'deliberate indifference' standard, rather than Turner's 'reasonably related' standard."). Furthermore, even if *Turner* applied, the 24-hour lights would be arbitrary because the needs for the lights articulated by the Government could be satisfied by a guard making rounds with a flashlight.

Accordingly, and for the reasons expressed in Petitioner's November 17, 2023 submission, the constant illumination is unlawful and should be enjoined. (*See* Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 9–10, 21.)

### 2. **Excessive Noise**

The Government argues that the excessive noise in the SAMs unit is lawful. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 16–17.) Once again, the Government cites no controlling authority and no in-circuit cases. Even in out-of-circuit cases, however, the dividing line on whether excessive noise states is an Eighth Amendment violation is whether it has harmed the incarcerated person's mental health. *See Brown v. Moore*, 93 F. Supp. 3d 1032, 1042 (W.D. Ark. 2015). Here, Mr. Schulte has unquestionably put forth evidence that the excessive noise has harmed his mental health.[7]

In addition, the Government once again inappropriately invokes *Turner* to justify the excessive noise, but *Turner* does not apply to Eighth Amendment claims. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 17; *Johnson*, 543 U.S. at 51.) Furthermore, even if *Turner* applies, the excessive noise is arbitrary because Mr. Schulte cannot communicate through the steel doors on his cell—a fact unrefuted by the Government.

Accordingly, and for the reasons expressed in Petitioner's November 17, 2023 submission, the excessive noise is unlawful and should be enjoined. (*See* Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 12, 22.)

### 3. **Nutrition**

The Government asserts that the nutrition being provided to Mr. Schulte is lawful. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 17–19.) Once again, the Government cites no controlling cases or even in-circuit cases. The Second Circuit, however, has stated that, where food provided to a specific prisoner is "unusually unhealthy" as to

---

[7] On December 21, 2023, the undersigned was able to get Mr. Schulte to sign the declaration found at Dkt. 50-2. On that day, and subsequently, the undersigned asked the Government to propose any redactions before counsel filed it on the docket. (Emails available upon request.) Today, the Government indicated that it would actually withdraw its prior motions to redact portions of Petitioner's filings and file a request to that effect later this week. (Email available upon request.) Accordingly, the undersigned should be able to file an unredacted and signed version of Petitioner's declaration this week—which, of course, is also available upon the Court's request.

that prisoner, the Government violates the Eighth Amendment. *Willey v. Kirkpatrick*, 801 F.3d 51, 69 (2d Cir. 2015) ("[N]otwithstanding that 'courts in this Circuit routinely have dismissed' inadequate-nutrition claims, Willey's claim is not that all restricted diets are unconstitutional, but that the particular food he received was.") Under that standard, Mr. Schulte has clearly put forth evidence indicating that the nutrition being provided is inadequate as to him.

In addition, the Government once again inappropriately invokes *Turner* to justify the inadequate nutrition, but *Turner* does not apply to Eighth Amendment claims. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 17; *Johnson*, 543 U.S. at 51.) Furthermore, even if *Turner* were to apply, the limitation on Mr. Schulte's nutrition is arbitrary, as it could be resolved by simply giving him access to the general population commissary.

Accordingly, and for the reasons expressed in Petitioner's November 17, 2023 submission, the inadequate nutrition being provided to Mr. Schulte is unlawful and should be enjoined. (*See* Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 10–12, 21.)

### 4. <u>Commissary</u>

The Government argues that claims about commissary are not cognizable under 28 U.S.C. § 2241. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 19–20.) Petitioner, however, is not challenging his loss of commissary, *per se*, but raising it in the context of his lack of nutrition and as related to his due process claim because his total isolation includes lack of access to the tablet, which the Government now concedes is available to other people incarcerated at the MDC. (*See* Dkt. 51 at 3.)

### 5. <u>Cold</u>

With respect to Mr. Schulte's claims about exposure to cold weather in the winter months, the Government cites a number of district court cases finding that brief periods of exposure to extreme cold categorically do not violate the Eighth Amendment. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 20–21.)

Petitioner respectfully points this Court to *Trammell v. Keane*, 338 F.3d 155, 164 (2d Cir. 2003), which states that deliberate indifference to exposure to cold in the winter months violates the Eighth Amendment—without reference to length of exposure—and asks the Court to apply that straightforward standard here. Petitioner believes that the facts in the record in this case easily satisfy that standard and the requested relief is justified and reasonable. (*See* Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 8–9, 20.)

### 6. <u>Communication with Others</u>

In justifying the extreme restrictions on Mr. Schulte's communication, the Government

addresses only the restrictions on mail. (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 21–22.) Petitioner, however, challenged the mail delay, the 30-minute limit on phone calls, and the 4 hour limit on visits. (Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 22–23.) As to all of those claims, restrictions must (1) "further an important or substantial governmental interest unrelated to the suppression of expression," and (2) "be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez*, 416 U.S. 396, 407 (1974).

Here, the SAMs only authorize a mail delay of 14 days, yet Mr. Schulte's mail is delayed for an average of 33 days—a point unrefuted by the Government. (*See* Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 8–9, 22.) In addition, the SAMs do not restrict phone calls nearly as much as the MDC does. (*See id.*) Accordingly, the restrictions on Mr. Schulte's communication violate *Procunier* because they are far greater than is necessary to protect the Government interest, even under the already extractive SAMs.

Accordingly, and for the reasons expressed in Petitioner's November 17, 2023 submission, the restrictions on Mr. Schulte's communication are unlawful and should be enjoined.

### 7. Free Exercise of Religion

On the merits, the Government cites a single non-controlling, out-of-circuit case to defend its interference with Mr. Schulte's free exercise of religion—*Alexander v. Collins*, No. 19-CV-261, 2021 WL 1541033, at *11 (W.D. Va. Apr. 20, 2021). (Respondent's Proposed Findings of Fact and Conclusions of Law, Dkt. 50-3, at 22–23.) That case, however, is inapposite. In it, the plaintiff failed to identify exactly how his free exercise of religion was being impinged upon. (*See id.*) Here, Mr. Schulte has clearly identified how the Government is impinging on his free exercise of his religion—by (1) preventing him from observing Ju'umah with other Muslims, and (2) by preventing him from praying at the required times by denying him an alarm clock. (*See* Supplemental Submission in Support of Joshua Adam Schulte's Petition for a Writ of Habeas Corpus, Dkt. 50-1, at 9–10, 22–23.)

Accordingly, and for the reasons expressed in Petitioner's November 17, 2023 submission, the restrictions on Mr. Schulte's free exercise of religion are unlawful and should be enjoined.

### C. Conclusion

For the reasons explained above, Petitioner respectfully submits that the Court should vacate the 2023 SAMs. Short of that, Petitioner respectfully submits that the Court should enjoin the conditions of his confinement that are not authorized by the 2023 SAMs and the Constitution and federal law.

Petitioner thanks the Court for its attention to this matter.

BELDOCK LEVINE & HOFFMAN LLP
Hon. Eric R. Komitee
January 16, 2024
Page 11

                                                      Sincerely,

                                                      Keegan Stephan, Esq.
                                                      *Associate*

cc: David Cooper (via ECF)